633 A.2d 1315

**OAKMONT PRESBYTERIAN HOME, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 11, 1993.

Decided Nov. 9, 1993.

564

Andrew S. Price, for petitioner.

Kathleen Grogan, Asst. Counsel, for respondent.

Before PALLADINO, FRIEDMAN and KELLEY, JJ.

FRIEDMAN, Judge.

Oakmont Presbyterian Home (Oakmont) petitions for review of an order of the Department of Public Welfare's (DPW) Office of Hearings and Appeals which, upon recommendation of a hearing examiner, disallowed certain depreciation costs Oakmont submitted as part of its medical assistance reimbursements for fiscal years 1984, 1985 and 1986. Specifically, DPW refused to accept Oakmont's "common date of expiration" method of calculating allowable Medicaid depreciation reimbursement on fixed assets for these years, at a cost to Oakmont of $30,909.[1] We affirm.

Oakmont was originally designed in 1949 as a residential facility for the elderly. In the 1960s, with the passage of the Medicaid and Medicare programs,[2] Oakmont was converted to a licensed long-term care nursing facility for the elderly, a change which required considerable structural improvements and additions to Oakmont's original building. DPW, the agency authorized to administer Pennsylvania's Medicaid program, conducts audits of such nursing facilities at the end of each fiscal year, and based on those audits, reimburses the facilities for allowable costs associated with their provision of services to Medicaid-eligible patients. Upon enrollment in the Medicaid program as a long-term health care provider, Oakmont reported depreciation of its fixed depreciable assets, i.e., its building and building additions, based on a 60–year estimated useful life. In 1980, on the advice of independent auditors,

---

1. This figure is undisputed by the parties.

2. In 1965, the United States Congress amended the Social Security Act to establish the Medicare and Medicaid reimbursement programs, 42 U.S.C. §§ 1395–1396p, added by Act of July 30, 1965, Pub.L. No. 89–97, 79 Stat. 291. The program is jointly funded and administered by the federal government and the states which elect to participate, including Pennsylvania.

Oakmont changed the estimated useful life of these assets from 60 years to 40 years. As part of this relifing process, Oakmont gave all building additions and improvements a common date of expiration, reporting that the useful life of the additions would expire on the same day as the original 1949 building. As a result, Oakmont's Medicaid cost report reflected an increase in the amount of depreciation from $111,-725 in 1979 to $146,966 in 1980. From 1980 through 1983, Oakmont continued to report its depreciation expenses based on a depreciation schedule with a 40–year useful life and a common date of expiration for all fixed assets.

Initially, in 1980, DPW's Medicaid auditors disallowed the depreciation increase resulting from Oakmont's relifing of its assets. Oakmont challenged DPW's disallowance of its reported depreciation cost for fiscal years 1980 through 1983 in a consolidated Medicaid audit appeal. In July 1984, following hearings but before the DPW's Office of Hearings and Appeals rendered a final order in the matter, Oakmont requested a waiver from DPW permitting Oakmont to relife its building and building additions from 60 to 40 years, in accordance with the guidelines of the American Hospital Association, for cost reporting periods ending December 31, 1980 and going forward. On October 2, 1984, DPW issued a final order granting Oakmont's request for relifing. Thereafter, Oakmont and DPW entered into a Stipulation of Settlement (Settlement) resolving the depreciation dispute for the years 1980 through 1983, and DPW reimbursed Oakmont for those years based upon the depreciation schedule submitted by Oakmont with a 40 year useful asset life and a common expiration date. Paragraph 6 of the Settlement provided that Oakmont "may not change any asset lives involved in these matters from the lives permitted by the Order of October 2, 1984, at any time hereafter with respect to Program reimbursement until and unless the regulations of the Department are amended to expressly so permit." (R.R. at 60a.)

In 1984, 1985 and for 12 days in 1986, until Oakmont discontinued both its operations and its participation in the Medicaid program, Oakmont continued to submit annual Med-

icaid cost reimbursement reports to DPW, seeking reimbursement for depreciation expenses incurred on its fixed building assets based upon a 40–year useful life schedule with a common date of expiration. In each of these years, DPW recognized Oakmont's use of a 40–year useful life for its fixed assets but refused to accept a depreciation schedule based on a common date of expiration for those assets, despite the fact that, as a result of the Settlement, DPW previously accepted Oakmont's common date of expiration methodology for audit years 1980–1983. DPW's disallowance of depreciation for audit years 1984, 1985 and 1986 cost Oakmont $30,909 in Medicaid program depreciation reimbursement. Oakmont filed separate Medicaid audit appeals from the 1984, 1985 and 1986 audit disallowances, which were consolidated in an evidentiary hearing before the hearing examiner.[3] On August 14, 1992, the hearing examiner issued a recommendation to deny Oakmont's consolidated appeals which was adopted in its entirety by DPW's Director of Hearings and Appeals in an order dated September 11, 1992.

On appeal,[4] Oakmont argues that (1) the August 14, 1992 recommendation and the September 11, 1992 order adopting that recommendation, both denying Oakmont reimbursement for depreciation expenses based on a 40–year useful life with a common date of expiration for audit years 1984–1986, are erroneous and inconsistent with the hearing examiner's Findings of Fact; (2) DPW's refusal to reimburse Oakmont for allowable depreciation on its fixed building assets based upon a 40–year useful life with a common expiration

3. In the consolidated appeal, Oakmont challenged DPW's Medicaid audit disallowance of $59,079 in depreciation for fiscal year 1984, $56,828 for 1985 and $3,619 for twelve days in 1986.

4. Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Atlas Development Association, Inc. v. Department of Public Welfare*, 138 Pa.Commonwealth Ct. 24, 587 A.2d 817 (1991). DPW's interpretation of its own regulations must be upheld as long as the interpretation is consistent with the regulations and is not plainly erroneous. *Episcopal Hospital v. Department of Public Welfare*, 107 Pa.Commonwealth Ct. 272, 528 A.2d 676 (1987).

date is contrary to applicable state and federal Medicaid cost reimbursement regulations, [specifically the state regulations found in DPW's Manual For Allowable Cost Reimbursement For Skilled Nursing and Intermediate Care Facilities, codified at 55 Pa.Code § 1181.201–1181.274, and the federal government's policy for recapturing depreciation expressed in section 104.17 of the Medicare Provider Reimbursement Manual (HIM–15) ]; [5] and (3) DPW's refusal to continue to reimburse Oakmont for depreciation on its fixed assets based on a 40–year useful life and a common date of expiration violated the 1985 Settlement with Oakmont.

■ Taking these arguments out of order, we will consider Oakmont's second contention first. Oakmont argues that, under the circumstances here, the state and federal regulations controlling Medicaid program depreciation reimbursements not only permit but require use of a common date of expiration in calculating allowable Medicaid depreciation. DPW's authorized method and procedure used to calculate allowable capital asset depreciations for facilities which provide nursing care services to Medicaid eligible patients are set forth at 55 Pa.Code § 1181.259. Oakmont specifically refers to two subsections of this provision in support of its argument. 55 Pa.Code § 1181.259(e), which requires use of the straight line method of depreciation, also states that the useful life of a particular asset may be shorter than its fiscal life depending upon its usefulness to the provider.[6] 55 Pa.Code § 1181.-259(g) requires that the method and procedure used for computing depreciation, including assigned useful lives, shall be applied consistently from year to year.

■ With regard to these provisions, Oakmont asserts that it used a straight line method of depreciation as required by § 1181.259(e) and was otherwise consistent with that provision

5. 1 Medicare & Medicaid Guide (CCH) ¶ 4695.

6. However, a useful life may not be less than the relevant useful life published by the Internal Revenue Service or the Uniform Chart of Accounts and Definitions for Hospitals published by the American Hospital Association for the particular asset on which the depreciation is claimed. 55 Pa.Code § 1181.259(g).

by using a common expiration date based on the life of its main building. Oakmont reasons that if its 1949 main building is scheduled for complete abandonment on a specific date, then the useful life of any of that building's additions and improvements would end on that same date, requiring a common date of expiration. In addition, Oakmont asserts that because depreciation on capital assets used to provide compensable services to medical assistance recipients is an allowable cost under 55 Pa.Code § 1181.259(a), the provisions in HIM–15 regarding the depreciation of building additions should be followed.[7] Section 104.17 of HIM–15 provides that "[t]he estimated useful life of an asset is its expected useful life to

7. HIM–15 is a source of more detailed information regarding allowable costs under the program, but it cannot be applied to alter the treatment of any cost provided for in DPW's own regulations. *See Morris Manor, Inc. v. Department of Public Welfare,* 127 Pa.Commonwealth Ct. 483, 561 A.2d 1342 (1989). In this regard, 55 Pa.Code § 1181.201 provides:

 (a) This subchapter, under applicable Federal and State statutes and regulations, sets forth principles for determining the allowable costs of general and county skilled and intermediate care facilities. This subchapter governs MA payments to general and county skilled nursing and intermediate care facilities on the basis of the Commonwealth's approved State plan for reimbursement.

 (b) The Medicare Provider Reimbursement Manual (HIM–15) and the Federal regulations appropriate to the reimbursement of nursing facility care under the Medicare program are a supplement to this subchapter. If a cost is included in this subchapter as allowable, then the HIM–15 and the applicable Federal regulations will be used as a source of more detailed information on that cost. The HIM–15 and applicable Federal regulations will not be used for any cost that is determined to be nonallowable either by a statement to that effect in this subchapter or by virtue of the fact that the cost is not being addressed in this subchapter, nor will the HIM–15 or applicable Federal regulations be used to alter the treatment of any cost provided for in this subchapter.

 Although DPW concedes that depreciation on fixed assets is an allowable cost, DPW points out that HIM–15 cannot be utilized to alter the treatment of costs provided for in DPW's own regulations. Asserting that the Settlement only allowed for a decrease in the useful lives of Oakmont's assets and did not contemplate Oakmont's change to a common expiration date methodology, DPW reasons that HIM–15 would be inapplicable here because, under Oakmont's theory of recovery, HIM–15 would be used to alter Oakmont's treatment of depreciation by allowing Oakmont to report in a fashion inconsistent with its prior reporting and, therefore, disallowed under 55 Pa.Code § 1181.-259(g). Because of our disposition of this issue, we need not consider the merit of DPW's contention.

the provider, not necessarily the inherent useful or physical life." HIM–15 § 104.17, 1 Medicare & Medicaid Guide (CCH) ¶ 4695; R.R. at 40a. Moreover, HIM–15 directs that

[t]he costs of a building addition may be depreciated over the remaining useful life of the primary building to which it is appended, rather than over the inherent physical life of the building addition, if the provider intends to demolish or abandon the primary building and the building addition upon the expiration of the useful life of the primary building.

HIM–15 § 104.17, 1 Medicare & Medicaid Guide (CCH) ¶ 4695; R.R. at 40a. Oakmont points out that this is precisely the case here; in fact, Oakmont maintains that because its facility no longer operates, its decision to use a common expiration date conforms totally with HIM–15 requirements, and DPW's refusal to reimburse Oakmont based on its use of that method goes contrary to controlling authority. We disagree.

Oakmont's reasoning seems compelling, and, indeed, Oakmont might have been justified in seeking to depreciate its building and building additions using a common date of expiration; however, Oakmont failed to follow the prescribed procedure which would have allowed it to do so. HIM–15, although permitting facilities to depreciate building additions using the same useful life as the building to which they have been attached, does not make this depreciation method automatically available. Rather, HIM–15 requires that a health care provider first "must demonstrate to the intermediary by convincing evidence a clear intention to demolish or abandon the building addition at the expiration of the [40 year] useful life of the primary building." HIM–15 § 104.17, 1 Medicare & Medicaid Guide (CCH) ¶ 4695. Here, Oakmont provided no evidence that it ever properly sought or received this permission; therefore, we conclude that Oakmont has not complied with the requirements set forth by HIM–15 as a prerequisite

to establishing a common date of expiration for a building and its additions.[8]

Oakmont also argues that DPW's conduct fails to comply with the capital asset depreciation schedule submitted by Oakmont and approved by DPW as part of the Settlement. Oakmont contends that because it used the identical method to calculate depreciation in 1984, 1985 and 1986 as was used in the Settlement for years 1980 through 1983, DPW must accept it. DPW counters that the Settlement had no precedential effect. We agree with DPW.

■ In seeking the administrative waiver, Oakmont specifically requested DPW's permission to change the useful lives of its depreciable fixed assets from 60 years to 40 years; nowhere in its request for waiver did Oakmont indicate that it also desired to use a common date of expiration for these assets. (R.R. at 65a–72a.) Moreover, the Settlement is devoid of any reference to a common date of expiration. (R.R. at 59a–61a.) Nor does the October 2, 1984 order granting Oakmont's request make any mention of a common date of expiration but merely permits Oakmont to "relife its assets from 60 years to 40 years." (R.R. at 62a–63a.) In short, DPW was not asked to consider, nor did it address Oakmont's use of a common date of expiration methodology for calculating allowable depreciation. The regulations provide that the method and procedure for computing depreciation shall be applied consistently from year to year. 55 Pa.Code § 1181.-259(g). Because Oakmont's requested waiver related only to

8. This result conforms with *Finley Hospital (Dubuque, Iowa) v. Blue Cross and Blue Shield Assoc./Blue Cross of Iowa*, PRRB Hearing Dec. No. 84–D37, February 6, 1984, 1 Medicare and Medicaid Guide (CCH) ¶ 33,645. In that case, the Provider Reimbursement Review Board (Board) determined that depreciation on a building addition constructed solely as an environmentally and structurally dependent adjunct to a basic hospital building, which had a remaining useful life of 33 years, had to be based on the addition's inherent useful life, which, under AHA guidelines, was 40 years. As here, the provider in *Finley* claimed that depreciation on the addition should be based on a 33 year useful life because the addition was useful only as long as the basic structure remained operational. However, because the provider never sought or received approval for a different useful life from the intermediary, the Board rejected that argument.

changing useful lives, all other aspects of Oakmont's depreciation cost reporting were unaffected by the DPW's grant of this waiver.

Oakmont concedes that the October 2, 1984 order does not ever use the words "with a common date of expiration;" however, Oakmont asserts that the depreciation schedule which it submitted for audit years 1980–1983 reflected a common date of expiration for the main building and all fixed assets connected to that building. Thus, Oakmont maintains that through the Settlement, DPW expressly "approved" of this method for calculating allowable depreciation incurred from 1980 through 1983, and because consistency is required, DPW is now bound to continue to accept it. We disagree.

■■■ A settlement agreement encompasses the compromise of a pending legal claim. *Barsons and Overbrook, Inc. v. Arce Sales Corp.,* 227 Pa.Superior Ct. 309, 324 A.2d 467 (1974). Here, the Settlement between DPW and Oakmont was the basis for Oakmont's withdrawal of its consolidated Medicaid audit appeals for fiscal years 1980 through 1983. Because DPW's Settlement with Oakmont concerns only these years, it does not act to bind DPW to anything beyond that time. Additionally, because a settlement agreement is considered a contract under Pennsylvania law, the document must "speak for itself" and cannot be given a meaning other than that expressly stated within the agreement itself. *Rivers v. Delaware Valley Mutual Casualty Co.,* 196 Pa.Superior Ct. 475, 175 A.2d 87 (1961); *Delaware River Port v. Thornburgh,* 137 Pa.Commonwealth Ct. 7, 585 A.2d 1123 (1989). Although the Settlement sets forth Oakmont's amended certified costs, the *method by which these increased costs were calculated is neither incorporated in nor discernable from the agreement.*[9]

---

9. This matter is covered in paragraph 3 of the Settlement, which provides in its entirety:

3. The Department shall amend on its accounts [Oakmont's] certified costs as follows, pursuant to the Order of October 2, 1984:
(a) 1980—increase by $9,172.00
(b) 1981—increase by $9,945.00
(c) 1982—increase by $24,538.00
(d) 1983—(1st half)—increase by $15,643.00

Thus, we must dismiss Oakmont's claims regarding the precedent setting effect of the Settlement.

Finally, we address Oakmont's first argument; i.e., that the hearing examiner's recommended denial of Oakmont's Medicaid audit appeal and DPW's September 11, 1992 order adopting that recommendation, are erroneous and inconsistent with the hearing examiner's Findings of Fact. With regard to this issue, Oakmont specifically points to the hearing examiner's Findings 21 and 25, which state:

21. The reimbursement paid to [Oakmont] for 1980 to 1983 was based upon the depreciation schedule submitted by [Oakmont] with a 40 year useful life and a common date of expiration.

25. Oakmont is entitled to the depreciation reimbursement of $30,909 for 1984 and 1985 and 1986.

(Hearing Examiner Findings of Fact Nos. 21 and 25; R.R. at 123a.) Oakmont maintains that these findings, which were supported by uncontested testimony and documentary evidence, must inevitably lead to the conclusion that Oakmont's position is correct; yet, in seeming disregard of his own findings, the hearing examiner reached a contradictory conclusion and recommended denial of Oakmont's appeals. Accordingly, Oakmont urges us to reverse DPW's order adopting the hearing examiner's recommendation and to direct DPW to pay Oakmont the $30,909.00 to which it is "entitled." We must disagree.

■■ First, as to Finding 21, we believe that it is entirely consistent with the recommendation made by the hearing examiner regarding fiscal years 1984 through 1986. The hearing examiner specifically concluded that DPW, through the Settlement, accepted Oakmont's 40–year, common date of expiration schedule only for fiscal years 1980 through 1983 and created no precedent for subsequent years thereby. (R.R. at 128a.) We must admit, however, that we cannot fathom how Finding 25, in which the hearing examiner ac-

(c) 1983—(2nd half)—increase by $16,591.00
(R.R. at 59a.)

knowledges Oakmont's entitlement to depreciation reimbursement in the full amount sought by Oakmont in its appeals, can co-exist with his denial of those appeals.[10] Nevertheless, the existence of this inexplicable finding by the hearing examiner does not alter the outcome here.

■ Although the hearing examiner has labeled this statement a "Finding of Fact," it is actually a conclusion of law,[11] and, as such, it is error. Here, however, the hearing examiner also expresses a second conclusion of law, appropriately located in the conclusion portion of his recommendation opinion, which diametrically opposes "Finding" 25. It is this second conclusion, denying Oakmont's entitlement to an additional $30,909.00 in allowable depreciation, which DPW adopted in its September 11, 1992 order, and it is this order which Oakmont asks us to review on appeal. Accordingly, for the reasons set forth in this opinion, we affirm.

## ORDER

AND NOW, this 9th day of November, 1993, the order of the Department of Public Welfare's Office of Hearings and Appeals, dated September 11, 1992, is affirmed.

10. Even DPW admits that this finding "creates confusion" regarding the conclusions reached in this appeal; however, DPW urges that we not consider this finding in a vacuum when determining whether its administrative adjudication is supported by substantial evidence. Substantial evidence supports an administrative decision when, from an examination of the entire record and inferences drawn therefrom, a reasonable person might have reached the same conclusion. *Helm v. Workmen's Compensation Appeal Board (U.S. Gypsum Co.)*, 139 Pa.Commonwealth Ct. 587, 591 A.2d 8 (1991); *Leroi v. Civil Service Commission of Philadelphia*, 34 Pa.Commonwealth Ct. 190, 382 A.2d 1260 (1978). DPW maintains that when the entire record here is examined, it clearly supports the depreciation disallowance. However, in view of our own resolution of this issue, we find no need to comment on the approach suggested by DPW.

11. Whether a statement is a finding of fact or a legal conclusion is not determined by the heading under which it has been placed. *Wells–Moore v. Workmen's Compensation Appeal Board (McNeil Consumer Products Co.)*, 144 Pa.Commonwealth Ct. 382, 601 A.2d 879 (1992). As a legal conclusion, "finding" 25 is properly reviewable by this court. *Stevens v. Workmen's Compensation Appeal Board (Pennsylvania Gas and Water Co.)*, 124 Pa.Commonwealth Ct. 486, 556 A.2d 522 (1989).